May it please the Court, I'm David Dean with James and Hoffman, appearing for the Airport Service Workers and their union, the appellants. These workers lost their union and their family health benefits when the employer purported to repudiate its collective bargaining agreement along with its agreed recognition clause. I'd like to take a few minutes to talk about the status quo claims first, turn briefly to the interference claim, and then deal with the statute of limitations issues. I'm intending to reserve about three minutes for rebuttal. Simply put, repudiation is not the way that agreements are changed or terminated under the Railway Labor Act. At the center of this case is, I think, the central purpose and policies of the Railway Labor Act. You already had a collective bargaining agreement. It was a collective bargaining agreement. Yes, they were under a collective. They were about two years into a three-year collective bargaining agreement and with an incorporated recognition clause. I think this Court is well aware that the central purpose of the Railway Labor Act is to prevent disruptions in commerce by ensuring stability of labor relations, and it does that by essentially enshrining agreements. So as recently noted by this Court in the Asig-Ambach case, the RLA prescribes a virtually endless process of negotiation, mediation, conciliation to resolve labor disputes, and during that process, it freezes agreed rates of pay rules and working conditions through its status quo provisions. The employer here was essentially looking for a loophole to be able to avoid that whole process in terminating or changing or terminating its collective bargaining agreement. And the lower court's ruling allowed it to, with an ipsy-dixit declaration of a, quote, representation dispute, unquote, walk away from the collective bargaining agreement, implement changed terms and conditions, and insulate itself from court review of its actions. We submit that that interpretation of Section 2-9 cannot be reconciled with the legislative intent and the historical context of the passage of the 1934 amendments of which Section 2-9 was a part. The court will recall the Railway Labor Act was passed in 1926 in the context of a heavily organized rail industry. In 1934, there was a set of amendments passed which Justice Brennan discusses at some length in the IAMV Street case and summarizes as amendments that were intended to strengthen the position of unions vis-a-vis carriers. The effect, it recalled now that all the unions that were operating in 1934 were doing so by virtue of voluntary recognitions. The lower court's interpretation of Section 2-9 would mean that the day after it was passed in 1934, every rail carrier in the country could have revoked its voluntary recognition, either announcing some doubt about the continuing majority support or not, and then unilaterally changed all of the terms and conditions in the agreements, and the only remedy that the employees or the unions would have had is to start all over again by going back to the National Mediation Board where the board would have first defined bargaining units, which would not necessarily have been the ones that had been defined by those by voluntary agreement since the board doesn't defer to those, then certified unions, and the unions would have had to start over again negotiating collective bargaining agreements. And meanwhile, the courts under Section 2-7 and 1-56 would have had, according to the lower court, no subject matter jurisdiction to enjoin the status quo working conditions. We submit that that's simply a completely untenable construction of Section 2-9. I want to make sure I understand this particular claim because it's different than the coercion and interference claims, correct? Correct. So what do you have to prove to establish a violation? That the carrier, without following the processes of the Act, changed existing working conditions here. While? I mean, what? Why do they have to maintain the status quo? What is it that they? Several reasons. I mean, the simple thing is that the union filed for National Mediation Board mediation on January 3, 2012. That should have held the status quo? That invokes a status quo requirement. The employer itself during the term of the CBA is required to go through the 1-56 process if it wants to change terms and conditions. So that begins with what's called a 1-56 or Section 6 notice by the employer. Here, the local construed the December 29 letter as a Section 6 notice. That is an announcement of an intent to change the contract. And 1-56 itself triggers a status quo requirement. So our position would be that the formal status quo requirements were triggered by the December 29 letter. And then they changed the status quo in January or February. Our position is that the status quo, the harm, the change that we are challenging, occurred the material breach from the local's perspective was the changing of wages and benefits in February. When did that happen? February. Yeah. February 10, I think the record reflects, is the first time that the employees received this or new wage scale, new benefits. And obviously the carrier had done so without negotiating those with the union. And therefore, at that time, so to speak, operationalized the lack of recognizing the union as the bargaining agent. And the district court said this is nothing but a little representation. What the lower court said, to the extent it's clear, is that the employer announcing a doubt about continuing majority support of the union created, because it was a voluntary recognition, created a representation dispute, which was then committed to the National Mediation Board. We think the lower court was essentially led astray by a line of cases that don't apply here for several reasons. And that line of cases he refers to, he cites, I think, IBT versus Texas International. He also cites IBT versus Frontier. But that line of cases concerned situations where unions had come to court to try to enforce bargaining agreements in a context of corporate restructurings where the shape of the bargaining unit has essentially changed to include employees who had not, either by certification or voluntary recognition, chosen a union or a representative. And in that context, in early times, I must say, the courts stepped back and said, we see a representation issue here because these employees are involved who have never been subject to a collective bargaining agreement or union representation or perhaps another union, and we're not going to step on the toes of the National Mediation Board and resolve that dispute. Now, this circuit has had a different view of the analysis or that line of cases, and we cite the Transamerica case where Judge Pregerson took the position that the court did have subject matter jurisdiction because the status quo and the interference claims were implicated and could step in and resolve that with an injunction despite the fact that there had been the equivalent of a corporate restructuring in the sense that the airline there had formed a non-union subsidiary and was transferring work from the existing sub. So let me just ask one along this line. This status quo claim is not tied, is not affected by the statute of limitations issue. Well, the lower court did not apply the statute of limitations to the issue. To this claim. To the status quo claim. I would technically, I think that's probably because, or it could be because, the lower court felt it didn't have or analyzed that it did not have subject matter jurisdiction, so it didn't reach the statute of limitations defense. If the court has jurisdiction, there is a, there are. But all three claims are subject to the six-month statute of limitations, correct? Correct. The district court handled them differently below.  So let me have you turn to the statute of limitations. The application for mediation didn't address the status quo claims, right? Or it didn't seek to mediate interference claims? Well, our view is the interference claim accrued with the changing of the wages and benefits in February. The mediation application was filed in January to address that change. And it's interesting. And the aviation safeguard talks about health benefit deductions ending in January. Can you address that? The benefit deductions or the union dues deductions? The health, there was health benefit deductions. There's a dispute, a factual dispute, setting aside the equitable tolling. Okay. And whether that would apply. It seems to me that there's a factual dispute between the parties as to exactly what date would apply. For the accrual. Right, for the breach. For the breach of the status quo? Right. Yeah. I mean, there is a dispute. My understanding of what the, I call him a carrier, they're derivative carriers of the Royal Labor Act. My understanding of the carrier's position is that because it wasn't deducting union dues in January and it had already paid for January in terms of benefits, that somehow the union was on, you know, that it's any cause of action it had for a change in the status quo accrued earlier than February. Our position is that the announcement on December 30, 29 and 30, because it also wrote a letter to the employees. It was an anticipatory breach. So if we don't accept the equitable tolling argument, given that there's factual dispute as to the date of the breach, how should this court handle that? I don't think it's a factual dispute in the sense that, I mean, to tell you the truth, the union doesn't have any idea whether union dues were deducted or not deducted. Our position is that it legally doesn't matter. The local, the union, can't be charged with knowledge of it, and we've cited cases to that effect, if they stop deducting dues.  The union would not normally take that to be a material breach of the collective bargaining agreement. The question for the local was, did it receive its dues check in February? And it did not, and that's the first time that it didn't. And so I don't know that there we have an engagement. So your position is the factual record is there that we can look at that and make a determination as to whether these claims fall within the six-month statute? Rather than remanding it for the district court to do it in the first instance? If your focus is on the question of whether there was dues deduction, I mean, we don't oppose it. We don't know one way or the other. So just to clarify, so what's the union's position as to when the cause of action for or the claim, cause of action, accrued for the status quo violation, alleged violation? I would say probably February 10, 2012. And that's because? That's when the wages and benefits first changed for the employees. You always have equitable estoppel. Correct. And here what happened is the employer announced that it was going to change the wages and benefits in February. It didn't just make the announcement. It had two factual predicates. It said it had received a petition that showed lack of majority support and that there was a lack of an NMB certification. The local, construing this as an anticipatory breach, challenged both of those factual predicates immediately in an attempt to get the employer to change course. So it filed with the mediation board, and interestingly, the employer, although now it says that that was a non-sequitur and off point, at the time it fully participated in the pre-docketing investigation that the mediation board began, and it took the formal position in the NMB record that if the NMB docketed the case, that would be an effective certification of the union. And we didn't emphasize that point in the briefing. It's at excerpt of record 901 where we put in the mediation board record. But so our position is we addressed the question of certification. We were litigating exactly the same issues, frankly, that we're litigating now. Briefs were put in both sides. We were asking the mediation board to make a finding of fact about whether or not the union continued to be the representative, which it essentially was forced to do because it will only take mediation applications from representatives. It won't take them from just any entity or employee out in the world. And it took six months for it to do it. I mean, that we hounded them to try to get them to go ahead and make a decision. I think they felt they had been constrained, you know, to make it. They didn't necessarily want to make it, but they finally did make it in June, and they docketed and they ordered the carrier to mediate. That whole period should be told. Agreed. I want to make sure I understand one thing. During that six-month period, there was nothing that prevented you from going to district court, though. Well, I would point to the ACIG ombank decision and Section 8 of the Norris LaGuardia Act, which required the local to exhaust available governmental machinery for mediation before the court would have had jurisdiction of the very injunctive claims that we're talking about under the status quo. So I think the local was doing exactly what it was directed to do, as clarified by the ACIG ombank ruling, in trying to both get this thing mediated by the mediation board and, again, in the same way that the carrier now says, oh, that pre-docking investigation didn't mean anything, you know, docking it didn't mean anything, that was not its position. It also says, oh, you can't mediate, how could you resolve this through discussion? Well, in fact, the parties entered discussions, resolved the issues with a memorandum of agreement that was the employer made conditional on the approval of the trust fund, which was not forthcoming, and that's in the Andrew Guyton Declaration, Excerpts of Record 803. And I talked to that only to rebut this charge of undue delay in waiting for the mediation board to act on the pre-docketing and, you know, the discussions. I also want to make sure I understand your argument on the coercion and interference claim as to when your position is when that cause of action accrued. Yeah. Same as for status quo? Yes, they overlap. We're challenging it. If you read the complaint in the case, and, again, this is not a we've been charged with, it's kind of a post hoc reconstruction. The complaint in the case, the interference claims in the case, which were both the state interference and the federal interference, focused on not coerced petitions. They focused on withdrawal of recognition and not honoring the terms and conditions in the collective bargaining agreement, which is what happened in February. Now, we think the pre-2012 facts, the 2011 facts, do have a role in the case, but what they are are evidentiary facts that show, first, the motive of the employer when it changed the terms and conditions in February, and we look to the Texas and New Orleans case from 1930 as a close analogy to that. And we say that those facts, should this court be inclined to change, and I would argue, the basic policy of the act and provide some kind of loophole or exception to the processes that would focus on something like a good faith doubt about continuing majority status, and there is a developed doctrine on that under the NLRA, if you were inclined to do that, we would look directly to the 2011 facts and say, excuse us, but that completely rebuts any allegation of good faith that the employer here can make about having a doubt. I mean, you don't have to wade into what, from my point of view, are out-of-the-ballpark facts in terms of the employer's involvement in this, but if you focus on the fact that it created this desert petition, it made it available to the employees, it collected it, they're way over the line in any forum under any law in terms of that being some sort of showing of employee desires in terms of representation. So we rebut good faith, we show motive. But that's the only relevance of the pre-2011 facts. For us, the causes of action here... When they started their activity, could you have gone into court with a... To stop the coercion? Right. Probably. To be honest, the facts as they come in through the employees are... Generally, you get different reports from different people. There were certainly two or three employees who were anti-union and were out talking to people. What the local did, and again, I would submit this is the appropriate response, is not to run to court and file a two-third, two-fourth claim, was it engaged on the ground to ensure that it kept the majority support of the employees no matter what the employer was doing. And as a result of that, was able to, in September when this activity started, and again, we didn't know at the time that the command security board had passed a SEIU initiative that was going to decertify the union no matter what the employees thought. We took seriously the idea that there were some dissatisfied employees, and so we needed to go out there, talk to the employees, find out what the majority support was or wasn't, and as a result was able to give a petition to the employer in September that showed overwhelming or majority support for the union. So that, again, from our perspective, rather than running to court on a two-third, two-fourth claim, we dealt with that issue and in fact prevented the employer from ever collecting a majority of cards against the union, which is presumably one reason that despite having promised the mayor to do so and told the trust fund that it was going to submit this petition to some neutral third party, they were talking about a retired judge from ADR services, they never did because, in fact, they didn't put this petition into the district court. They didn't give it to the NMB when it asked them to substantiate their charge of lack of majority support that they were trying to predicate withdrawing recognition on. Again, all of this led the union to believe that we could, by negating these two factual predicates, we could get them to reverse course and that when the mediation board told them to mediate, they would mediate. Okay, thank you. Let's hear from the other side. Good morning, Your Honors. Mark Spring. I represent Safeguard Aviation. A couple of things I want to address. I'm pleased with the court. I believe there's two issues in this case. The first issue deals mostly with the status quo claims and that's the representational dispute issue and whether or not this is a representational dispute or not. The second deals with the fourth and fifth causes of action, the six-month statute of limitations, although the six-month statute of limitations also applies to the status quo claims, and I believe counsel was correct in that the district court never reached that issue because it found that it didn't have jurisdiction in the first place. On the status quo claims, how do you distinguish the Transamerica case, which characterized a major dispute or an action as major dispute when the employer's conduct is what undermines the representation issues? It's a factual distinction, Your Honor, because in the Transamerica case, what you had in that case was you had a situation where the company was trying to establish a separate non-union company. Transamerica had, there was no issue as to who represented the employees. They had a certified union. The Teamsters, I believe was the union, was certified in the airline pilot's Transamerica case. The issue, the central issue in that case was not whether or not, it was not a representational dispute. The central issue was whether or not they had violated the terms of the agreement and had the right to establish this separate non-union company for different work. So as the judge found in the district court case here, the central issue, the entire issue really, stems upon the finding by my clients as a result of the petition in December of 2011 whether or not there was representation or not. The key difference, and I think one of the differences is But there's certainly an aspect of a representational problem here, but the principle of Transamerica is still the same, isn't it, that it's really the employer's alleged conduct that forces the change in representation. Isn't that true in this case as well? No, because in this case it wasn't the employer's conduct. It was the petition that was presented to the employers. It was the employees signing a petition and deciding that they didn't want to be represented by the union. We can look at just the fact of that petition divorced from all of the alleged conduct that led up to the signing of that petition. Well, there's no conclusion that that conduct was improper. For whatever reason, the union chose they had every right to go to court when all of this was happening to challenge this conduct. There is, for good reason, a six-month statute of limitations. They decided not to do that. The other remedy they had is they could have certified the union. The council talked about a vote before a retired judge, a vote before the Los Angeles council, but the exclusive remedy was for them to go to the NMB and ask for this vote. If they had the votes, why didn't they do that? And quite frankly, they're not left without a remedy. Initially, the union came in and got a majority of the employees to express their desire to join the union, right? Back in 2008. It went back in 2008, and that's a proper way for a union to obtain recognition and to show that it represents the majority of employees and then sits down with the employer. They work out a collective bargaining agreement. Is that right? That's one way to do it. That's one way of doing it, and that's the way probably the majority of bargaining situations take place. They don't run to the board to get certification. They do it this other way, and it's just as legal and just as enforceable as if the board certifies it. So you go along, and then the company decides that it's costing them too much money, more than they thought it would, to provide medical care for the employees. Isn't that what happened next? That's the allegation. That's the allegation, yeah. And so then the employer, through its employees, and now all these folks are there working, comes and talks to them about why the union is not good for them, and they can make more money if they get rid of the union. So they go around and have these cards signed up. That's what happened, right? That's certainly the allegation. No, that didn't happen that way. Some of that is stipulated too, and the record is undisputed, yes. So that's not the proper way if the employer has got a problem with a collective bargaining agreement, and that has a term. What was the term of that bargaining agreement? I believe at the time the letters were sent in December, there was around another year to go. Another year, whatever it was to go. Well, so what the employer was doing was undermining the union. It had the employees there telling them, if you got rid of the union, we could pay you more money. But what? Is that a proper way to do it? Well, I think the issue is whether or not it's a legal way to do it. Is that a legal way to do it? Yes, because the union was not certified. I don't think that has anything to do with it, whether it was certified or not. It has the same status as if it were certified. I believe that the case law that we cited, including the two unpublished cases, the IAM versus Continental case out of the Southern District of Texas and the Doolah case, the Central District case, make it very clear. Those are not authority. I understand they're not binding authority on this court. I think there's been a development of the law that since 1934, when those amendments got put in, as counsel indicated earlier, that if you as the union want to have the protections of the Railway Labor Act, the exclusive way to get those protections is to go in and apply to be certified. It doesn't have to be by a vote. The terms allow for the NMB to do an investigation, and then it could be by vote. It could be by card authorization. But they never applied to the NMB. They never applied to get certified as a Railway Labor Act. That's not required. Where in the statute is that required, or what case says that that's required? Well, the two cases that I just – What circuit authority do you have? I don't have any circuit authority. Is there any provision in the statute that supports that? I think the language of the statute, as we indicated in the brief. What language? What precise language supports that statement? When the – Let me get the statute up. Okay. I don't have the language of the statute handy, Your Honor. The totality of the statute. And the fact that the courts, circuit courts included, have found that the exclusive way to certify a union is through this election procedure or through the procedures of Section 2-9. So if you don't go through the procedures of Section 2-9, 152-9, then you certainly, as Judge Bregerson indicated, you can certainly recognize the union, but it doesn't have the same effect as a certified union. And to some extent, I think that's the key. I would refer – If it's not certified by the board, then as soon as the collective bargaining agreement is signed, then the employer can start working on the employees in the way they're dealt with to start convincing them right away that they don't want the union, even though they've signed the cards accepting the union as their representative, and that if they get rid of the union, we can do much better together. That's all right, huh? Well, no, that's not okay. If they're going about it in a way that is improper interference, then the remedy is for the union to go to court. But they certainly have the – Did they announce to the union that we're going to go in there? No, you're not certified, so you're on thin ice. And we're going to go in there, and we're going to talk to the employees, and we're going to convince them that they made a mistake signing in with this union, and we're going to do whatever we can. We're going to tell them we're going to give them more money. We're going to get them better benefits because of medical care that's in the collective bargaining agreement. There's something about that where they're overcharging, and you're not getting enough coverage, and all the rest of that. We'll do better for you all the way along. Get rid of the union. No, but I don't think that that's a prerequisite that they have to announce that to the union. Why not? Isn't that fair? They're just going to go in there and pull off a sneak attack? Is that what it is? No, they're dealing – Is that what this country is all about? No, Your Honor. You want to go back to the days where workers were at the mercy of the employer? On the railroads, if an employer was killed because of defective equipment, then all the railroads had to do was go see the widow, give her $50, and that was it. No, I don't – Maybe you want to go back to that? No, I don't think that that's the case, and I think that if – That's why we got the railroad. That's why we got this railroad. I understand that that's the basis for the Railway Labor Act, but I think the context of this case – And that's something that – that's a process that's taken a long, long time in this country, going all the way back to the railroad strikes, you know, at the end of the 19th century, with Debs and all the rest of them, you know, people trying to do something for these folks that worked on the railroad. That's where we got some protection for working people. I understand. But not to depend on the good graces of the employer, you know. So if they get together and they convince the employer that we have the cards, we have the majority, let's sign an agreement, and everybody signs an agreement. You can't enforce it unless you get it certified. That's a long process. And we can go in and do what we can to undermine you. That doesn't seem right, does it? Well, the way you described it, no, Your Honor, but I don't believe that that's what happened here. Let me just make sure I understand. Your point is that when the union employees brought the petition in December, that had the effect of doing what? That the employer then had the right not to recognize the union. At that point? At that point. And it did that in the December 29 and December 30 letter, which maybe given my time running out I can't. Just answer the questions. Yes. So when it brought them the petition, because the union was not certified, therefore it had the right to exercise if they wanted, and they did, to no longer recognize the union as the majority, unlike the National Labor Relations Act, which has automatic certification during the penancy of a contract. Can you address counsel's claim that the statute of limitations wasn't triggered until February? Yes. So if you recall what counsel said when he got up here, because I do think it needs to be looked at differently from the interference claims and with the status quo claims. So let me address. The accrual is different. Yes, exactly. So let me start with the status quo claims, okay? As counsel said in one of the first things he said when he got up here, he indicated that the union, the local, interpreted the letter as a change of status quo. So that has to be, just from that statement, that has to be when the status quo claims started to accrue. The other thing is I don't think you can ignore. But they didn't kick in until, when did they actually kick in, the changes? Well, the changes kicked in immediately, and let me explain why, Your Honor, because you cannot ignore the specific language of the collective bargaining agreement. The language of the collective bargaining agreement in Article I, the very first article, says that we will recognize the union. That's a term of the actual agreement. We will recognize the union. So when you look at the letters that were sent on December 29th and December 30th, they say, the 29th letter says, and I'm quoting, we are hereby withdrawing recognition from your union immediately. The December 30 letter to the employees says, aviation safeguards withdraws all recognition, withdraws, not will withdraw, not is going to withdraw. And then they said that they were going to immediately stop deducting dues. So it didn't say we're going to withdraw recognition. We plan to. It said we are withdrawing recognition. This is a term of the agreement. That changes the status quo then, because the status quo of the agreement requires recognition. They say they're not. So the status quo claim accrues immediately as of the dates of the letter. You're saying in the collective bargaining agreement that the union agreed that recognition could be withdrawn the next day? No, I'm saying they had the right to, Your Honor. What? I'm saying they had the right to, not to. They had the right. In other words, they signed an agreement. The purpose of it is to get labor peace in the marketplace. And this is a common way that unions get recognized. And then you're saying that the very next day the employer can write to the union and say, ha-ha, you signed this, but it doesn't mean anything because we're not going to comply with it. The agreement's over with. Because there was a petition presented, yes, because they were not certified. We went out and we talked to the employees and we got some votes and you no longer represent the majority. They couldn't do that, huh? Yes, that's our position, Your Honor. When did they file their request to the mediation board? January 3. When did the union file it? Yes. January 3. So they said, well, you can't do that. We want to mediate this, right? That's basically what they said. Well, and you can't mediate the interference claim. No, no, I'm talking about the non-recognition business. Right, but on January 30th we sent a letter indicating that there's two arguments I would make to that, Your Honor. Number one is on January 30th we sent a letter saying we're not willing to participate in the mediation. That letter's in the record. I don't have the cite to it. I think it's in Mr. Fogelman's declaration with the summary judgment motion. So if there was some tolling or some forth, it certainly shouldn't go beyond that, number one. Number two is, as I think Your Honor pointed out or indicated in a question, that the very same case, the Transamerica case, indicates that they could have filed with the district court at any time. Mediation is not a prerequisite, and I believe that's what this court found in Transamerica. So it shouldn't act as a tolling. I thought the status quo kicked in when they, obligation, when they made the request to the board. Well, that's why I don't understand how they could argue it started later. If they're number one standing here and saying that the, on one hand, that the union interpreted this letter to be a change of status quo, and then four days later or whenever they received it, two or three business days they're down claiming they want mediation for this, then the claims obviously accrued. Well, let me phrase my question another way. Does the status quo obligation kick in as soon as you sent that letter, saying we no longer recognize you? Well, it's our position, of course, that we don't have any obligation to maintain the status quo because we didn't have any obligation. I don't find that, that's not a, I don't find that, I don't really understand that argument. Once there's no duty to recognize you. What you're saying is that you, is that the employer, as Judge Pregerson was alluding to, what you're saying is the employer could just, having signed this agreement, it's good for three years, you've decided you don't want it, and it's over. And nothing else attaches. You have no rights. That can't be what the law is. No, no, no. The remedy is to get, to go down and get certified. And that remedy existed at any time while, before the agreement was finalized, during the term of the agreement, or at any time after December 30th. They could have gone down to the national. I mean, so what's the effect of the agreement that they had? It was just sort of a, well, we'll work with you and that's it? But we don't want to be part of this anymore? No, because it wasn't we don't want to be part of this. As indicated in the record, there was many votes taken and much time that took place, and it was only after there's a legitimate showing that the majority of the employees don't want the union anymore. We're going along, but I just want you to, just for a few minutes, you said there's a difference in the accrual of the statute of limitations for the interference and coercion claims. Yes, so the status quo claims accrued in December. The other claims accrued before that. The claims of interference deal with the things that we've been talking about, the discussions with the employees, the hiring of the crews and associates. That's what they were objecting to. That's what the district court found in the summary judgment motion, what the district court said in the summary judgment motion, and its ruling is correct, and that is that all of those claims accrued before December 30th. That's when the interference took place. And as a result, the six-month statute of limitations applies, and the mediation had nothing to do with the interference claims. That had to do with the status quo claims. There's no procedure for mediating interference claims, so it certainly wouldn't act as tolling. And so filing your complaint July 31 of 2012 is too late. That's kind of tricky. This case is very tricky, actually. Having just gotten involved in it three weeks ago, that made it even more tricky. Anything else? You've only been here three weeks. Yes, Your Honor. Do you feel secure in your position? Yes, Your Honor. Okay. Real quick, if I can, Your Honor, for one minute. I would state that if the two summary judgment motions are not intertwined, the ruling by the district court involves clearly totally legal issues on jurisdiction and statute of limitations. The issue on plaintiff's motion for summary judgment involves factual issues, and we would submit factual disputes. Many of the facts that came in, actually, in supplemental pleading. So if the court was to disagree with my argument, we believe that the proper thing would be not to rule on the plaintiff's summary judgment, but to send it back to the district court for further proceedings. Thank you, counsel. Thank you. I'll give you a minute. It's been a long session. We have one more case to go yet, so we need to move it along. I understand. I want to be certain that we're clear. I understood you to be asking me when did the status quo obligation attach, which is different than when the status quo was violated. The status quo obligation attached our position December 29 and 30 when effectively a notice under 156 was communicated by the employer saying, I intend to change the terms in February. It was violated when they changed the terms in February without having gone through the processes of the act. So it attached the obligation, which changes under Transamerica, well, actually, the initial IAM via LOA decision, again, by Judge Pregerson, distinguished between when you violate a collective bargaining agreement, that has to be adjudicated by a system board. When you violate a status quo, even though that is nothing but the terms of the collective bargaining agreement, the court has jurisdiction to adjudicate the violation and award damages. So that's why it matters when the status quo obligation attached, but then the violation, the accrual of the violation in February. And I would, again, just emphasize that the employer fully participated in the mediation board process through January and February in the pre-docketing investigation, and I would refer you to our brief at pages 36 and 37 to clarify that the obligations under 2-3rd, 2-4th, one, they apply certainly to a designated union, and in fact the Supreme Court in TWA v. IFA held that they apply principally to employees before they certify a union. So there's no question that what the carrier was doing in 2011 was inappropriate. We didn't sue over it. We engaged it on the ground. We resolved it through a process other than a court suit. We got majority support from the employees. We're asking the court here to issue a status quo injunction, that is to say to rule for us on our motion for summary judgment, to declare the purported repudiation of the CBA ineffective, to enjoin a return to the pre-dispute contract rights and the prescribed wages and benefits to enjoin the carrier to mediate with us in front of the board. Let me ask you, I just have one last question for you. For the equitable tolling, what's the primary case that you rely on? IAM via LOA. Okay. And remand to the district court for damages to be calculated for the period. Thank you. Thank you very much, counsel. It's an interesting case and it's difficult. Thank you.
judges: Pregerson, Paez, Nguyen